## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

DANIELA ARROYO GONZÁLEZ; VICTORIA
RODRÍGUEZ-ROLDÁN; J.G.; and PUERTO
RICO PARA TOD@S,

*Plaintiffs*,

v.

RICARDO ROSSELLÓ-NEVARES, in his
official capacity as Governor of the
Commonwealth of Puerto Rico; RAFAEL
RODRÍGUEZ-MERCADO, in his official capacity
as Secretary of the Department of Health of the
Commonwealth of Puerto Rico; and WANDA
LLOVET-DÍAZ, in her official capacity as
Director of the Division of Demographic Registry
and Vital Statistics of the Commonwealth of
Puerto Rico,

*Defendants*.

Civil No. 3:17-cv-01457-CCC

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND ........................................................................ 3

    A.   Sex and Gender Identity ..................................................................... 3

    B.   The Parties ........................................................................................... 3

    C.   The Birth Certificate Policy and Its Harm to Transgender Persons. ........................ 4

III.  ARGUMENT ................................................................................................. 6

    A.   Puerto Rico's Birth Certificate Policy Violates the Equal Protection
        Guarantee. ............................................................................................ 7

        1.   *The Birth Certificate Policy is subject to heightened scrutiny because
            it impermissibly discriminates against transgender people on the basis
            of sex.* ............................................................................................. 8

        2.   *Discrimination based on transgender status itself is subject to
            heightened scrutiny.* ..................................................................... 10

        3.   *The Birth Certificate Policy prohibits an entire class of people from
            exercising their fundamental rights.* ............................................. 11

    B.   Puerto Rico's Birth Certificate Policy Infringes Plaintiffs' Fundamental
        Rights to Privacy, Individual Dignity, Liberty, and Autonomy. ........................... 12

        1.   *The Birth Certificate Policy infringes upon the fundamental right to
            informational privacy of transgender persons.* ............................. 12

        2.   *The Birth Certificate Policy infringes on Plaintiffs' fundamental rights
            to decisional privacy, liberty, individual dignity, and autonomy.* .................. 15

    C.   The Policy Impermissibly Compels Speech, Violating the First Amendment. ........ 18

        1.   *The Birth Certificate Policy impermissibly compels transgender
            persons to publicly speak and identify with a sex and identity contrary
            to who they are.* ............................................................................ 19

        2.   *The Birth Certificate Policy compels Plaintiffs to disclose personal
            and sensitive private information to third parties.* ......................... 20

    D.   The Birth Certificate Policy Cannot Be Justified Under Any Standard of
        Review. ............................................................................................... 21

        1.   *There is no rational basis for the Birth Certificate Policy.* ........................... 21

        2.   *Puerto Rico's Birth Certificate Policy fails under both heightened and
            strict scrutiny.* ............................................................................... 24

IV.   CONCLUSION ............................................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. City of New York*,
 143 F. Supp. 3d 134 (S.D.N.Y. 2015)..........................................................11, 14

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
 133 S. Ct. 2321 (2013)....................................................................................18

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dept. of Educ.*,
 208 F. Supp. 3d 850 (S.D. Ohio 2016) ...........................................................11

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
 531 U.S. 356 (2001).........................................................................................24

*Bloch v. Ribar*,
 156 F.3d 673 (6th Cir. 1998) ...........................................................................13

*Borucki v. Ryan*,
 827 F.2d 836 (1st Cir. 1987)............................................................................13

*Bowen v. Gilliard*,
 483 U.S. 587 (1987).........................................................................................10

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)...........................................................................................6

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
 473 U.S. 432 (1985)...............................................................................7, 10, 21

*Cressman v. Thompson*,
 798 F.3d 938 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 145 (2016).....................21

*Daury v. Smith*,
 842 F.2d 9 (1st Cir. 1988)..........................................................................12, 13

*Davenport v. Wash. Educ. Ass'n*,
 551 U.S. 177 (2007).........................................................................................19

*Doe ex rel. Doe v. Yunits*,
 No. 001060A, 2000 WL 33162199 (Mass. Super. Oct. 11, 2000) .........................17

*Doe v. Town of Plymouth*,
 825 F. Supp. 1102 (D. Mass. 1993) .................................................................14

*Eastwood v. Dep't of Corr. of State of Okl.*,
    846 F.2d 627 (10th Cir. 1988) ........................................................................13

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972)..........................................................................................24

*Evancho v. Pine-Richland Sch. Dist.*,
    CV 2:16-01537, 2017 WL 770619 (W.D. Pa. Feb. 27, 2017)..................7, 9, 10, 11

*Ex parte Delgado Hernández*,
    165 D.P.R. 170 (2005) .......................................................................................5

*Fabian v. Hosp. of Cent. Conn.*,
    172 F. Supp. 3d 509 (D. Conn. 2016).........................................................8, 9, 10

*Fournier v. Reardon*,
    160 F.3d 754 (1st Cir. 1998)...........................................................................12

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) ....................................................................8, 9

*Golinski v. Office of Pers. Mgmt.*,
    824 F. Supp. 2d 968 (N.D. Cal. 2012) .......................................................10, 11

*Grutter v. Bollinger*,
    539 U.S. 306 (2003)..........................................................................................24

*Hager v. Sec'y of Air Force*,
    938 F.2d 1449 (1st Cir. 1991) .........................................................................21

*Heller v. Doe*,
    509 U.S. 312 (1993)..........................................................................................21

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995).........................................................................................20

*K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*,
    No. 3AN-11-05431-CI, 2012 WL 2685183 (Alaska Super. Ct. Mar. 12, 2012) ...13, 15, 22, 23

*Kallstrom v. City of Columbus*,
    136 F.3d 1055 (6th Cir. 1998) ........................................................................14

*Kuperman v. Wrenn*,
    645 F.3d 69 (1st Cir. 2011)...............................................................................7

*Lawrence v. Texas*,
    539 U.S. 558 (2003).............................................................................15, 16, 17

*Love v. Johnson*,
  146 F. Supp. 3d 848 (E.D. Mich. 2015)...........................................................13, 14, 15, 23, 25

*Loving v. Virginia*,
  388 U.S. 1 (1967).................................................................................................................10

*Mass. v. U.S. Dept. of H.H.S.*,
  682 F. 3d 1 (1st Cir. 2012)...................................................................................................21

*Meloon v. Helgemoe*,
  564 F.2d 602 (1st Cir. 1977).................................................................................................12

*Nat'l Aeronautics and Space Admin. v. Nelson*,
  562 U.S. 134 (2011).............................................................................................................12

*Nixon v. Adm'r of Gen. Servs.*,
  433 U.S. 425 (1977).............................................................................................................12

*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) ...........................................................................10, 11

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)...........................................................................15, 16, 17, 18, 22

*Olivencia-de-Jesus v. Puerto Rico Elec. Power Auth.*,
  85 F. Supp. 3d 627 (D.P.R. 2015) .......................................................................................18

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*,
  475 U.S. 1 (1986).................................................................................................................20

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992).............................................................................................................15

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009).............................................................................................................19

*Plyler v. Doe*,
  457 U.S. 202 (1982).............................................................................................................11

*Powell v. Schriver*,
  175 F.3d 107 (2d Cir. 1999)..............................................................................................13, 14

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989)...............................................................................................................9

*Richards v. Thurston*,
  424 F.2d 1281 (1st Cir. 1970)...............................................................................................17

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)..................................................................................19, 20, 21

*Roberts v. Clark Cty. Sch. Dist.*,
    215 F. Supp. 3d 1001 (D. Nev. 2016) ..................................................................9, 10

*Rockwood v. SKF USA Inc.*,
    687 F.3d 1 (1st Cir. 2012)..........................................................................................6

*Romer v. Evans*,
    517 U.S. 620 (1996).................................................................................7, 21, 22, 24

*Rosa v. Park W. Bank & Trust Co.*,
    214 F.3d 213 (1st Cir. 2000)..................................................................................8, 9

*Rumble v. Fairview Health Servs.*,
    No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015)) .........................10

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.*,
    547 U.S. 47 (2006)..................................................................................................19

*Schroer v. Billington*,
    424 F. Supp. 2d 203 (D.D.C 2016) ........................................................................10

*Schroer v. Billington*,
    577 F. Supp. 2d 293 (D.D.C. 2008) .........................................................................8

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) .........................................................................8, 9, 10

*Shelton v. Tucker*,
    364 U.S. 479 (1960)................................................................................................20

*Sessions v. Morales-Santana*,
    No. 15-1191, 582 U.S. ---, 2017 WL 2507339 (June 12, 2017) ...................9, 22, 24

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ................................................................................8, 9

*Sterling v. Borough of Minersville*,
    232 F.3d 190 (3d Cir. 2000).....................................................................................13

*Tapalian v. Tusino*,
    377 F.3d 1 (1st Cir. 2004)..........................................................................................7

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994)................................................................................................19

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973)...........................................................................................21

*United States v. Virginia*,
    518 U.S. 515 (1996).............................................................................................8

*United States v. Westinghouse Elec. Corp.*,
    638 F.2d 570 (3d Cir. 1980)...............................................................................14

*United States v. Windsor*,
    133 S. Ct. 2675 (2013)...................................................................................8, 17

*Vargas v. Toledo Davila*,
    No. 08-1527, 2010 WL 624135 (D.P.R. Feb. 17, 2010).......................................13

*Veasey v. Perry*,
    71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, vacated in part, rev'd in
    part, sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc)................2

*Vega-Rodriguez v. Puerto Rico Tel. Co.*,
    110 F.3d 174 (1st Cir. 1997)...................................................................12, 13, 15

*Wash. Legal Found. v. Mass. Bar Found.*,
    993 F.2d 962 (1st Cir. 1993)...............................................................................18

*Whalen v. Roe*,
    429 U.S. 589 (1977)............................................................................................12

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    No. 16-3522, 2017 WL 2331751 (7th Cir. May 30, 2017)...........................8, 9, 23

*Wooley v. Maynard*,
    430 U.S. 705 (1977).......................................................................................18, 20

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001)............................................................................................18

*Zalewska v. City of Sullivan, N.Y.*,
    316 F.3d 314 (2d Cir. 2003)...............................................................................17

**Statutes**

24 L.P.R.A. § 1133 ...................................................................................................5

24 L.P.R.A. § 1136 .................................................................................................24

24 L.P.R.A. § 1231 .......................................................................................... *passim*

42 U.S.C. § 1983......................................................................................................12

## Other Authorities

Associated Press, *Delaware Adopts New Transgender Birth Certificate Rules*,
The News Journal, Nov 4, 2016...................................................................................25

Cathy Bussewitz, *Hawaii Eases Process To Switch Gender On Birth Certificates*,
The Orange County Register, July 13, 2015...............................................................25

Chai R. Feldblum, *The Right to Define One's Own Concept of Existence: What
Lawrence Can Mean for Intersex and Transgender People*,
7 Geo. J. Gender & L. 115 (2006) ............................................................................16

Defs.' Mot. to Dismiss (ECF No. 22) ............................................................................5

Emily Hewlings, *Massachusetts Ends Surgery Requirement For Legally
Changing Gender On Birth Certificates*,
Daily Hampshire Gazette, Aug. 24, 2015 .................................................................25

Fed. R. Civ. P. 56(a). ......................................................................................................6

G.A. Res. 217A (III), Universal Declaration of Human Rights (Dec. 10, 1948) .........17

Jed Rubenfeld, *The Right of Privacy*, 102 Harv. L. Rev. 737 (1989)............................17

Jillian T. Weiss, *The Gender Caste System: Identity, Privacy, and
Heteronormativity*, 10 Law & Sexuality 123 (2001).................................................14

Kristena Hansen, *Oregon Shields Birth Record Changes for Transgender People*,
The Register-Guard, June 1, 2017 .............................................................................25

Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure
Accurate Gender Markers on Birth Certificates: A Good Government
Approach to Recognizing the Lives of Transgender People*,
19 Mich. J. Gender & L. 373 (2013)..........................................................................25

Michael Lavers, *Md. Birth Certificates Law Takes Effect*,
Washington Blade, Oct 5, 2015 .................................................................................25

Mitch Kellaway, *Connecticut Makes Changing Birth Certificates Easier for Trans
Folks*, The Advocate, June 30, 2015 .........................................................................25

Parker Malloy*, California Becomes Easiest Place for Trans People to Amend
Birth Certificates*, The Advocate, July 2, 2014 ........................................................25

I.    **INTRODUCTION**

The United States Constitution prohibits Puerto Rico from refusing to recognize a person's gender identity on their birth certificate. Puerto Rico's policy and practice related to the correction of gender markers on birth certificates, based on the Vital Statistics Registry Act, including 24 L.P.R.A. § 1231 (the "Birth Certificate Policy"), denies transgender persons the ability to accurately record their sex, as determined by their gender identity, on government-issued birth certificates and forces disclosure of their transgender status. The Birth Certificate Policy infringes Plaintiffs' equal protection, due process, and First Amendment rights; deprives them of vital legal protections; and leaves them vulnerable to harm in virtually every aspect of their lives.

The ability to define and express one's identity, and to have that identity acknowledged and respected by one's government and society, goes to the very core of each person's fundamental rights to individual liberty, dignity, and autonomy. Indeed, few things are as essential or intimate to defining and expressing one's personhood as the ability to identify as one's gender.  This is as significant to an individual as the rights to make decisions concerning marriage, procreation, and childrearing, long deemed fundamental. Yet Puerto Rico denies transgender persons that right. None of the purported justifications advanced for the Birth Certificate Policy warrants the intentional imposition of such profoundly unequal treatment.

Every person needs a birth certificate that accurately reflects their identity. A person's birth certificate is a trusted and essential government-issued document that serves as proof of one's identity; it is in turn often the prerequisite to the identification and licensing documents that pave our way through life. Birth certificates are routinely required by employers, by educational institutions for enrollment, by agencies for benefits eligibility and program enrollment, and by all

levels of government as a prerequisite for other essential identification documents.[1]

However, in the Commonwealth of Puerto Rico, the gender marker originally placed on transgender persons' birth certificates is inaccurate. It is based on assumptions made solely upon viewing a baby's external reproductive organs at birth, without considering other relevant factors that ultimately determine a person's sex, including their gender identity. While for most people there is no discord between the sex assigned on their birth certificates at birth and their gender identity, for transgender persons there is, and these individuals are entitled to a path to fix this life-burdening problem. And, although the Commonwealth permits transgender persons to change their name on a birth certificate, it insists on leaving a strike-out over the original mis-gendering name, thereby forcing disclosure of transgender status and imposing a multitude of harms.

Even though birth certificates of transgender persons born in Puerto Rico are plainly inaccurate, the Commonwealth categorically refuses to correct the gender markers on birth certificates to accurately reflect these individuals' sex, as determined by their gender identity. This absolute bar is inconsistent policies prevailing throughout the United States, *see supra* n.14, as well as with Puerto Rico's own practice of permitting transgender persons to correct the gender marker on their driver's licenses.

Because, as a matter of law, none of the purported interests underlying Puerto Rico's Birth Certificate Policy provides a compelling, important, or even rational justification for the government's intentional imposition of profoundly unequal treatment and infringement of rights, this Court should grant Plaintiffs' motion for summary judgment.

---

[1] *See, e.g.*, *Veasey v. Perry*, 71 F. Supp. 3d 627, 670 (S.D. Tex. 2014) ("It is important that birth certificates be accurate in order for individuals to use them to obtain identification."), *aff'd in part, vacated in part, rev'd in part*, *sub nom. Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc).

II.    **FACTUAL BACKGROUND**

   **A.  Sex and Gender Identity**

   A person's sex is determined by multiple factors, including hormones, external and internal morphological features, external and internal reproductive organs, chromosomes, and gender identity. Decl. of Randi Ettner, Ph.D. ("Ettner Decl.") ¶ 15. Those factors may not always be in alignment. *Id.* at ¶ 17. Gender identity—a person's internal sense of their own gender—is the primary factor in determining a person's sex. *Id.* at ¶¶ 16, 17. It is a deeply felt and core component of human identity. *Id.* at ¶ 16.  According to the medical consensus, gender identity is innate, and attempts to change a person's gender identity are unethical and harmful to a person's health and well-being.  *Id.* at ¶¶ 21, 24. Biological factors—most notably the neurodevelopmental characteristics of a person's brain with respect to sex—play a role in gender identity development, and cannot be changed.  *Id.* at ¶ 22.

   The phrase "sex assigned at birth" refers to the sex recorded on a person's birth certificate at the time of birth. *Id.* at. ¶ 16. Typically, individuals are assigned a sex on their birth certificate solely based on the appearance of external genitalia at the time of birth. *Id.* at ¶ 13. A cisgender person is someone whose gender identity aligns with the sex they were assigned at birth. *Id.* at ¶¶ 18, 19. A transgender person is someone whose gender identity diverges from the sex they were assigned at birth. *Id.* at ¶ 13, 19.

   **B.  The Parties**

   Plaintiffs are transgender persons born in Puerto Rico and an organization that represents lesbian, gay, bisexual, and transgender ("LGBT") people and their families in their struggle for social inclusion, equality, and fairness in the Commonwealth. Decl. of Daniela Arroyo González ("Daniela's Decl.") ¶ 5; Decl. of Victoria Rodríguez Roldán ("Victoria's Decl.") ¶ 5; Decl. of J.G. ("J.G.'s Decl.") ¶ 5; Decl. of Pedro Julio Serrano Burgos ("Serrano Decl.") ¶ 4.

Daniela Arroyo González is a woman. Daniela's Decl. ¶ 4. Her gender identity and expression is female (she looks, dresses, and expresses herself as a woman), but she was incorrectly assigned the sex of male at birth. *Id.* at ¶¶ 5, 8, 13, 14, 15. Likewise, Victoria Rodríguez Roldán is a woman. Victoria's Decl. ¶ 4. Her gender identity and expression is female (she looks, dresses, and expresses herself as a woman), but she was incorrectly assigned the sex of male at birth. *Id.* at ¶¶ 5, 7, 9, 11, 12. Finally, J.G. is a man. J.G.'s Decl. ¶ 4. His gender identity and expression is male (he looks, dresses, and expresses himself as a man), but he was incorrectly assigned the sex of female at birth. *Id.* at ¶¶ 5, 7, 11, 13, 15.

Like many transgender persons, Daniela, Victoria, and J.G. have successfully corrected some of their other identity documents in Puerto Rico and elsewhere (such as, *inter alia*, their driver's licenses and passports) to accurately reflect who they are, consistent with their gender identity. Daniela's Decl. ¶ 22; Victoria's Decl. ¶ 14; J.G.'s Decl. ¶¶ 17, 18. Unsurprisingly, they also wish to correct their Puerto Rico birth certificates to accurately reflect their gender identity and their chosen names. Daniela's Decl. ¶ 31; Victoria's Decl. ¶ 26; J.G.'s Decl. ¶ 33; Serrano Decl. ¶ 10. However, pursuant to the Birth Certificate Policy, they are prohibited from correcting their birth certificates in a manner that does not disclose their transgender status.

Defendants Ricardo Rosselló Nevares, Governor of the Commonwealth of Puerto Rico; Rafael Rodríguez Mercado, Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda Llovet Díaz, Director of the Division of Demographic Registry and Vital Statistics, are responsible for enforcement of the Vital Statistics Registry Act, including 24 L.P.R.A. § 1231, and are sued in their official capacities.

**C.   The Birth Certificate Policy and Its Harm to Transgender Persons.**

The Vital Statistics Registry Act (the "Act") provides that all birth certificates must include, *inter alia*, a newborn's place of birth, place of residence, given name and surnames, date of birth,

parents' names, and sex. *See* 24 L.P.R.A. § 1133. It is the practice and policy of the Commonwealth to determine the sex of newborns, for purposes of their birth certificates, based solely on external genitalia. *See Ex parte Delgado Hernández*, 165 D.P.R. 170, 198 (2005).[2]

Critically, no statute or regulation prohibits correction of the gender marker on a birth certificate to accurately reflect the sex of a transgender person. Nevertheless, the Supreme Court of Puerto Rico in *Ex parte Delgado* held that the Act, 24 L.P.R.A. § 1231, enforced by Defendants, does not permit transgender persons to correct the gender markers on their birth certificates. *See* 165 D.P.R. at 193-94 ("[I]t is not appropriate to authorize the change requested on the birth certificate of the petitioner to change petitioner's sex, because the Demographic Registry Law does not expressly authorize it."). And, as Defendants concede, they enforce a policy and practice, based on that interpretation of the Act, which categorically prohibits transgender persons born in Puerto Rico from correcting the gender marker on their birth certificates to accurately reflect their sex, as determined by their gender identity. *See* Defs.' Mot. to Dismiss (ECF No. 22) at 5-6, 12. Furthermore, in issuing name changes on birth certificates, Puerto Rico's practice is to show a strike-out line or redline through any information corrected, as delineated in 24 L.P.R.A. § 1231. Enforcement of this requirement on transgender persons, who commonly change their names to better match their gender identity, discloses their transgender status on the face of the birth certificate and exposes them to harm. Taken in conjunction, these applications of the Act by Defendants are the Birth Certificate Policy challenged by Plaintiffs.

Puerto Rico's Birth Certificate Policy erects a barrier to full engagement in society by transgender persons and subjects them to invasions of privacy, prejudice, discrimination, humiliation, harassment, stigma, and even violence. Daniela's Decl. ¶¶ 26-30; Victoria's Decl. ¶¶

---

[2] A certified translation of *Ex parte Delgado* is enclosed as Exhibit A to the Declaration of Omar Gonzalez-Pagan. Except where otherwise specified, exhibit numbers herein (e.g., Ex. _) refer to exhibits to that Declaration.

21, 23, 25; J.G.'s Decl. ¶¶ 26, 28-32; Serrano Decl. ¶¶ 12-14; Ettner Decl. ¶¶ 38-43. These concerns are particularly acute in Puerto Rico, where transgender persons face significant violence and stigma. *See*, *e.g.*, Serrano Decl. ¶ 11. The Birth Certificate Policy forces the disclosure of highly personal and sensitive information, such as a person's transgender status and medical condition, to others whom one might not trust or wish to know such information. *Cf.* Ettner Decl. ¶ 45.

For transgender persons who suffer from gender dysphoria,[3] being denied the ability to correct the gender marker on their birth certificates interferes with their medical treatment and increases their dysphoria and distress. *Id.* at ¶ 41. Moreover, transgender persons, whether or not they suffer from gender dysphoria, are harmed when prevented from aligning their lived experience with their true sex. The bar to having identification documents, such as a birth certificate, that accurately reflect a transgender person's true sex not only stigmatizes them, but also inhibits their ability to self-define and express their identity.

## III.    ARGUMENT

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986); *see also Rockwood v. SKF USA Inc.*, 687 F.3d 1, 9 (1st Cir. 2012); Fed. R. Civ. P. 56(a). Here, the undisputed material facts demonstrate that, as a matter of law, the Birth Certificate Policy violates Plaintiffs' constitutional rights.

---

[3] Gender dysphoria is the clinical distress often caused by the discordance between a person's gender identity and the sex to which they were assigned at birth. Ettner Decl. ¶ 25.

**A.   Puerto Rico's Birth Certificate Policy Violates the Equal Protection Guarantee.**

"The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment from their government." *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004); *see also Romer v. Evans*, 517 U.S. 620, 631 (1996); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Yet, because of the Commonwealth's Birth Certificate Policy, transgender persons born in Puerto Rico, including Plaintiffs, "are being distinguished by governmental action from those whose gender identities are congruent with their assigned sex." *Evancho v. Pine-Richland Sch. Dist.*, CV 2:16-01537, 2017 WL 770619, at *11 (W.D. Pa. Feb. 27, 2017).[4]

To establish an equal protection claim, a plaintiff must allege sufficient facts "from which a jury reasonably could conclude that, compared with others similarly situated, the plaintiff was treated differently because of an improper consideration," such as race, religion, or sex. *Kuperman v. Wrenn*, 645 F.3d 69, 77-78 (1st Cir. 2011). Here, Puerto Rico's Birth Certificate Policy prohibits *only* transgender persons, including Plaintiffs, from having birth certificates that accurately reflect their sex, as determined by their gender identity. It treats transgender persons born in Puerto Rico differently from similarly situated cisgender persons based on impermissible considerations, specifically sex and transgender status, as well as transgender persons' exercise of their fundamental rights to privacy, liberty, autonomy, and free speech.

The Birth Certificate Policy therefore creates a permanent underclass of people who are singled out and denied an accurate government-issued birth certificate based simply on their constitutionally protected personal characteristics. This stigmatized, second-class status cannot be

---

[4] Requiring a strike-out line for the corrections it allows, as delineated in 24 L.P.R.A. § 1231, similarly violates the equal protection guarantee as applied to transgender individuals, as it results in disclosure of a person's transgender status on the face of the birth certificate, inflicting harms not imposed on similarly situated cisgender persons.

squared with the basic dictates of the equal protection guarantee, which "withdraws from [the] Government the power to degrade or demean" any person in the way the Birth Certificate Policy does. *See United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013).

> **1.  *The Birth Certificate Policy is subject to heightened scrutiny because it impermissibly discriminates against transgender people on the basis of sex.***

It is incontrovertible that "all gender-based classifications . . . warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation marks omitted).  A policy that treats transgender persons differently "is inherently based upon a sex-classification and heightened review applies." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-3522, 2017 WL 2331751, at *12 (7th Cir. May 30, 2017).

By treating people differently based on their transgender status, Puerto Rico's Birth Certificate Policy impermissibly discriminates on the basis of sex. The weight of circuit authority—including authority from the First Circuit—has recognized that discrimination based on transgender status is discrimination based on sex. *See id.* at *9; *Glenn v. Brumby*, 663 F.3d 1312, 1316-19 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 573-75 (6th Cir. 2004); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000). Discrimination against transgender persons is recognized as sex discrimination in several contexts, including as impermissible sex stereotyping and as discrimination based on transgender status, each of which triggers heightened scrutiny.[5]

---

[5] Discrimination based on gender transition is also discrimination based on sex, just as discrimination based on religious conversion is necessarily based on religion. Firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion,' even if the employer "harbors no bias toward either Christians or Jews but only 'converts.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 306 (D.D.C. 2008); *accord Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016). Similarly, if Defendants treat men and women equally as a general matter but nonetheless discriminate against those who undertake gender transition, this conduct constitutes impermissible sex discrimination. *Schroer*, 577 F. Supp. 2d at 306.

**Sex Stereotyping.** Discrimination against transgender persons is inherently rooted in sex stereotypes, and therefore triggers heightened scrutiny. Sex discrimination encompasses any differential treatment on the basis of "sex-based considerations." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 251 (1989). "For close to a half century," the Supreme Court "has viewed with suspicion laws that rely on . . . fixed notions concerning [a particular] gender's roles and abilities." *Sessions v. Morales-Santana*, No. 15-1191, 582 U.S. ---, 2017 WL 2507339, at *11 (June 12, 2017) (alterations, citations, and quotations omitted).

Discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness," but also "discrimination because of the properties or characteristics by which individuals may be classified as male or female." *Fabian*, 172 F. Supp. 3d at 526. As such, "discrimination based on transgender status . . . is essentially the epitome of discrimination based on gender nonconformity, making differentiation based on transgender status akin to discrimination based on sex for these purposes." *Evancho*, 2017 WL 770619, at *11. "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 2017 WL 2331751, at *9; *see also Glenn*, 663 F.3d at 1316; *Smith*, 378 F.3d at 575; *Rosa*, 214 F.3d at 215-16; *Schwenk*, 204 F.3d at 1201.

**Transgender Status.**  Policies distinguishing between transgender and cisgender persons also unlawfully discriminate on the basis of sex because they allow people to be treated consistent with their gender identity *only if* that identity matches the sex they were assigned at birth. Such laws and policies are necessarily discrimination based on sex.

It would be no answer that the law treats everyone consistently with their birth-assigned sex. *See Roberts v. Clark Cty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1015 (D. Nev. 2016) ("Although CCSD contends that it discriminated against Roberts based on his genitalia, not his status as a

transgender person, this is a distinction without a difference here. Roberts was clearly treated differently . . . because of his transgender status."); c*f. Loving v. Virginia*, 388 U.S. 1, 8 (1967). "What matters" is that "the discrimination is related to . . . sex." *Schwenk*, 204 F.3d at 1202; a*ccord Fabian*, 172 F. Supp. 3d at 526-27. Here, that is beyond any material dispute.

Sex "is not a cut-and-dried matter of chromosomes," *Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C 2016), or external genitalia. *See* Ettner Decl. ¶ 15. To the contrary, a robust body of case law has held that gender identity is a critical determinant of sex itself. *See, e.g., Schwenk*, 204 F.3d at 1201-02; *Evancho*, 2017 WL 770619, at *13 ("[G]ender identity is entirely akin to 'sex' as that term has been customarily used in the Equal Protection analysis."); *Roberts*, 215 F. Supp. 3d at 1011; *Fabian*, 172 F. Supp. 3d at 526-27; *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015); *Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415, at *2 (D. Minn. Mar. 16, 2015). Gender identity "is deeply ingrained and inherent in the[] very beings" of transgender people, and like sex, "is neither transitory nor temporary." *Evancho*, 2017 WL 770619, at *13; *see also* Ettner Decl. ¶ 17. Discrimination based on gender identity—i.e., based on transgender status—is thus sex discrimination plain and simple.

### 2. *Discrimination based on transgender status itself is subject to heightened scrutiny.*

In identifying whether a classification triggers heightened scrutiny, the Supreme Court considers whether: (a) the class has historically been "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (b) the class's defining characteristic "frequently bears [no] relation to ability to perform or contribute to society," *City of Cleburne*, 473 U.S. at 440-41; (c) the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602; and (d) the class is "a minority or politically powerless." *Id.* While all four considerations need not be met to warrant heightened scrutiny, *see Golinski v.*

*Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983 (N.D. Cal. 2012), as other district courts have

found, all apply to transgender people:

> First, there is not much doubt that transgender people have historically been subject
> to discrimination including in education, employment, housing, and access to
> healthcare. Second, there is obviously no relationship between transgender status
> and the ability to contribute to society. Third, transgender people have immutable
> and distinguishing characteristics that define them as a discrete group, or . . . the
> characteristic of the class calls down discrimination when it is manifest. Finally, as
> a tiny minority of the population, whose members are stigmatized for their gender
> non-conformity in a variety of settings, transgender people are a politically
> powerless minority group.

*Bd. of Educ. of the Highland Local Sch. Dist. v. U.S. Dept. of Educ.*, 208 F. Supp. 3d 850, 874

(S.D. Ohio 2016) (citations, original alterations, and quotations omitted); *see also Evancho*, 2017

WL 770619, at *13; *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015);

*see also Norsworthy*, 87 F. Supp. 3d at 1119. The record here supports this conclusion.[6]

### 3.   *The Birth Certificate Policy prohibits an entire class of people from exercising their fundamental rights.*

Puerto Rico's Birth Certificate Policy must pass heightened scrutiny because it

discriminatorily burdens Plaintiffs' exercise of their fundamental rights to privacy, individual

dignity, liberty, autonomy, and free speech. *See* Section III.B-C, *infra*. Where, as here, a

governmental classification interferes with the exercise of a fundamental right, it triggers strict

scrutiny and may only survive if narrowly tailored to advance a compelling governmental interest.

*See Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

As discussed in Section III.D, *infra*, the Commonwealth cannot demonstrate an important

or compelling government interest—or even a rational basis—justifying its Birth Certificate Policy.

---

[6] The record demonstrates that transgender people have historically been subject to discrimination, *see* Ex. B, Ex. C, Ex. D; exhibit immutable or distinguishing characteristics that define them as a discrete group, *see* Ettner Decl. ¶¶ 21, 24, and which bear no relation to ability to perform or contribute to society, *see* Ex. F at 4, Ex. G; and are a minority with relatively little political power, *see* Ex. E, Ex. H.

**B. Puerto Rico's Birth Certificate Policy Infringes Plaintiffs' Fundamental Rights to Privacy, Individual Dignity, Liberty, and Autonomy.**

The Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. "Legislation which involves . . . fundamental rights invites strict scrutiny." *Meloon v. Helgemoe*, 564 F.2d 602, 604 (1st Cir. 1977) (citation omitted). A person's transgender status is an intimate, personal matter, and the decision to live in accordance with and express one's gender identity falls squarely within the right to constitutionally-protected privacy and liberty. The Birth Certificate Policy impinges upon these rights without sufficient justification.

"That a person has a constitutional right to privacy is now well established." *Daury v. Smith*, 842 F.2d 9, 13 (1st Cir. 1988); *see also Fournier v. Reardon*, 160 F.3d 754, 758 (1st Cir. 1998). As recognized by the Supreme Court, there are two distinct personal privacy rights recognized by the Fourteenth Amendment: "the individual interest in avoiding disclosure of personal matters," and "the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 601 (1977); *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 448-49, 457 (1977); *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 183 (1st Cir. 1997) (rights relate to "ensuring the confidentiality of personal matters" and to "ensuring autonomy in making certain kinds of significant personal decisions"). *Cf. Nat'l Aeronautics and Space Admin. v. Nelson*, 562 U.S. 134, 145 (2011). Both rights are implicated here. A person's transgender status is an intimate, personal matter, and the decision to live in accordance with and express one's gender identity is an important and deeply personal one that falls squarely within the right to decisional privacy.

**1. The Birth Certificate Policy infringes upon the fundamental right to informational privacy of transgender persons.**

The "constitutional right to privacy . . . includes 'the individual interest in avoiding

disclosure of personal matters.'" *Daury*, 842 F.2d at 13 (quoting *Whalen*, 429 U.S. at 599).[7]  The First Circuit has recognized that the "constitutional right of confidentiality is implicated by disclosure of a broad range of personal information," *Borucki v. Ryan*, 827 F.2d 836, 846 (1st Cir. 1987), including the "disclosure of medical, financial, and other intimately personal data." *Vega-Rodriguez*, 110 F.3d at 183.

Few areas involve as intimately personal and sensitive information as those pertaining to one's sexual orientation and gender identity. *See, e.g.*, *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3d Cir. 2000) ("disclosure of one's sexual orientation" is "protected by the right to privacy," as "such information is intrinsically private"); *Bloch v. Ribar*, 156 F.3d 673, 685 (6th Cir. 1998) ("Our sexuality and choices about sex . . . are interests of an intimate nature which define significant portions of our personhood . . . that we regard as highly personal and private."); *Eastwood v. Dep't of Corr. of State of Okl.*, 846 F.2d 627, 631 (10th Cir. 1988). A person's transgender status is particularly private, intimate personal information. *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) ("The excruciatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate."); *Love v. Johnson*, 146 F. Supp. 3d 848, 856 (E.D. Mich. 2015) ("[R]equiring Plaintiffs to disclose their transgender status . . . directly implicates their fundamental right of privacy."); *K.L. v. State, Dept. of Admin., Div. of Motor Vehicles*, 3AN-11-05431-CI, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012).[8]

---

[7] This Court has had the opportunity to examine the right to privacy as it relates to the disclosure of personal matters. *See Vargas v. Toledo Davila*, Civil No. 08-1527, 2010 WL 624135, at *6 (D.P.R. Feb. 17, 2010) (confirming that "an individual interest in avoiding disclosure of personal matters has been recognized as a constitutional right").

[8] The forcible disclosure of a person's transgender status can also result in disclosure of private medical information. While not every transgender person suffers from gender dysphoria, many, including Plaintiffs, do. The disclosure of a person's transgender status may lead to disclosure of private medical information, as gender dysphoria is associated solely with transgender persons. Ettner Decl. ¶¶ 25, 45. *Cf. United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) ("Information about one's body and state of health is a matter which the individual is ordinarily

The Birth Certificate Policy's forced disclosure of protected information arises from both the prohibition against gender marker corrections and the required display, under a strike-through line, of a former misgendered name. Both act as red flags that the birth certificate-holder is transgender. Given birth certificates' ubiquitous uses throughout society, branding Puerto Rico-born transgender persons for life with inaccurate birth certificates, which disclose their transgender status, exposes them to discrimination and practical harms. *See, e.g.*, *Adkins*, 143 F. Supp. 3d at 139-40 ("A mismatch between the gender indicated on the document and the gender of the holder calls down discrimination, among other problems."). "The constitutional right to privacy issue in regard to transsexuality arises from the existence of state records from which transsexuality can be determined and forcibly disclosed. The existence of the records poses some risk of disclosure, but more significantly, the disclosure of the information is compelled whenever such records are required for identification." Jillian T. Weiss, *The Gender Caste System: Identity, Privacy, and Heteronormativity*, 10 Law & Sexuality 123, 173 (2001).

The pervasiveness of the discrimination and abuse transgender persons suffer drives home the constitutional dimension of their interest in preventing forcible disclosure of their transgender status. *See Powell*, 175 F.3d at 111 (disclosure of transgender status may provoke "hostility and intolerance from others"). "'[W]here disclosure of this highly intimate information may fall into the hands of persons' harboring such negative feelings, the Policy creates a very real threat to Plaintiffs' personal security and bodily integrity." *Love*, 146 F. Supp. 3d at 856 (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063 (6th Cir. 1998) (original alterations omitted)).

As a result, courts have found that the forced disclosure of a person's transgender status through the government's refusal to issue accurate identity documents violates the constitutionally-

---

entitled to retain within the private enclave where he may lead a private life." (internal quotation marks omitted)); *Doe v. Town of Plymouth*, 825 F. Supp. 1102, 1107 (D. Mass. 1993).

protected right to informational privacy. *See Love*, 146 F. Supp. 3d at 856; *K.L.*, 2012 WL 2685183, at *8 (holding that "absence of any procedure for changing the sex designation on an individual's [driver's] license . . . threatens the disclosure of this sensitive personal information" and "impermissibly interferes with [the] right to privacy"). The Birth Certificate Policy thus infringes upon Plaintiffs' fundamental rights to privacy in connection with private and intimate personal information.

### 2. *The Birth Certificate Policy infringes on Plaintiffs' fundamental rights to decisional privacy, liberty, individual dignity, and autonomy.*

In addition to violating transgender persons' informational privacy rights, Puerto Rico's Birth Certificate Policy also infringes upon fundamental rights to decisional privacy and autonomy for transgender persons. "[T]here are certain areas of life so fundamentally important and private" that the government may not infringe upon them without burdening "an individual's autonomy or freedom to make those decisions." Scott Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. 159, 171-72 (2015); *see Vega-Rodriguez*, 110 F.3d at 183 (privacy rights extend to "decisions arising in the personal sphere—matters relating to marriage, procreation, contraception, family relationships, child rearing, and the like"). Few decisions are as deeply personal and important as the decision by transgender persons to live consistent with their gender identity—which is rooted in the constitutionally-protected rights to liberty and autonomy.

"The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons . . . to define and express their identity." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015); *see also Lawrence v. Texas*, 539 U.S. 558, 574 (2003) ("At the heart of liberty is the right to define one's own concept of existence") (quoting *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 851 (1992)). Constitutionally protected liberty interests are those that implicate "individual dignity and autonomy"—i.e., decisions or actions that "shape an

individual's destiny." *Obergefell*, 135 S. Ct. at 2597, 2599; *see also Lawrence*, 539 U.S. at 578. As the Supreme Court crystallized in *Obergefell*, the substantive protections of the Due Process Clause protect the right and choice of every person to possess and control their own person, and to define and express their own personal identity. *See* 135 S. Ct. at 2597.

Transgender individuals possess this liberty in equal measure with all others. As the Supreme Court has cautioned, "rights" cannot be "defined by who exercised them in the past"; otherwise, "new groups could not invoke rights once denied." *Id.* at 2602. Indeed, "[r]ights implicit in liberty and rights secured by equal protection . . . may be instructive as to the meaning and reach of the other," an "interrelation of the two principles [that] furthers our understanding of what freedom is and must become." *Id.* at 2603. Our founders "did not presume to know the extent of freedom in all its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning." *Id*. at 2598. Thus, "[w]hen new insight reveals discord between the Constitution's central protections and a received legal structure, a claim to liberty must be addressed." *Id.*

Applying these lessons, it is clear that the ability to live in accord with, to express, and to have legal recognition of one's true sex is entitled to protection under the Due Process Clause as a fundamental right. A person's core internal sense of their gender is profoundly central to their personal identity in ways the Constitution necessarily protects. This is as true for a transgender person as for a cisgender person.[9]

A person's liberty interest in their core, personal identity, and living in accordance with that identity, is severely infringed if the government denies recognition to, and acts to thwart, that

---

[9] *See* Chai R. Feldblum, *The Right to Define One's Own Concept of Existence: What Lawrence Can Mean for Intersex and Transgender People*, 7 Geo. J. Gender & L. 115, 116 (2006) ("[T]he liberty interest recognized by the court in *Lawrence*—the right 'to define one's own concept of existence'—is an interest that speaks directly . . . to the efforts of transgender people to define their gender identity and expression." (quoting *Lawrence*, 559 U.S. at 574)).

identity. Just as requiring a cisgender woman to mis-identify herself as a man on government-issued documents would be a great intrusion on individual liberty, so too does the Birth Certificate Policy impermissibly intrude on the liberty of transgender persons born in Puerto Rico to identify themselves and exist consistent with their identity. The ability to live in accord with and express one's true sex, as determined by one's gender identity, is "so fundamentally important . . . that the government may not, absent satisfying a heightened level of scrutiny, infringe or burden an individual's autonomy or freedom to make [such a] decision[]." Skinner-Thompson, *Outing Privacy*, 110 Nw. U. L. Rev. at 171-72.

This conclusion flows easily from the well-settled constitutional principle that the Due Process Clause's liberty protections extend to self-expression as an "intimate choice[] that define[s] personal identity and beliefs." *Obergefell*, 135 S. Ct. at 2597. In 2003, the Supreme Court held that a state cannot criminalize private sexual conduct of gays and lesbians because their "right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government." *Lawrence*, 539 U.S. at 578. Ten years later, the Supreme Court recognized that it was a deprivation of liberty not to extend legal recognition to the marriages of same-sex couples because it restricted those individuals' ability to "define themselves by their commitment to each other." *Windsor*, 133 S. Ct. at 2689.[10]

The conclusion that there is a fundamental right to a birth certificate accurately reflecting a transgender person's sex is further bolstered by the fact that, like sexual orientation, gender

---

[10] Courts and legal commentators alike have similarly recognized the liberty interests inherent in personal decisions about expression of one's identity. *See Zalewska v. City of Sullivan, N.Y.*, 316 F.3d 314, 321 (2d Cir. 2003); *Richards v. Thurston*, 424 F.2d 1281, 1284 (1st Cir. 1970); *Doe ex rel. Doe v. Yunits*, No. 001060A, 2000 WL 33162199, *3 (Mass. Super. Oct. 11, 2000) ("Plaintiff in this case is likely to establish that, by dressing in clothing and accessories traditionally associated with the female gender, she is expressing her identification with that gender. . . . Therefore, plaintiff's expression is not merely a personal preference but a necessary symbol of her very identity."); Jed Rubenfeld, *The Right of Privacy*, 102 Harv. L. Rev. 737, 782 (1989) ("Women should be able to abort their pregnancies so that they may avoid being forced into an identity."). *See also* G.A. Res. 217A (III), Universal Declaration of Human Rights, at 75 (Dec. 10, 1948).

identity is recognized by the courts—as well as medical and scientific experts—as immutable. *See* Ettner Decl. ¶¶ 21, 24; *see also* Part IV.A.2, *supra*. Because Plaintiffs—like other transgender persons—have no choice in their gender identity, which is immutable, Puerto Rico's Birth Certificate Policy improperly interferes with transgender persons' personal dignity and autonomy. Here, Plaintiffs "only real path" to the full and correct recognition of their true selves, consistent with their gender identity, along with access to government services and participation in public life, is the ability to correct their birth certificates to properly identify who they are. *See Obergefell*, 135 S. Ct. at 2594. The Commonwealth, which alone can confer on Puerto Rico-born Plaintiffs accurate birth certificates, deprives them of far more than a piece of paper. It deprives them of the dignity and autonomy to identify as who they are, and to live with the security and protection of the accurate government certification of identity on which all others can rely.

### C.   The Policy Impermissibly Compels Speech, Violating the First Amendment.

The First Amendment prohibits the Commonwealth from making any "law abridging the freedom of speech." U.S. Const. Amend I. The First Amendment "is multifaceted, preventing the government from prohibiting speech, and from compelling individuals to express certain views." *Olivencia-de-Jesus v. Puerto Rico Elec. Power Auth*., 85 F. Supp. 3d 627, 630 (D.P.R. 2015) (citing *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001)). Indeed, it is "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013) (quotations and citations omitted).

"The most obvious infringement on First Amendment rights in the context of compelled speech occurs when individuals are forced to make a direct affirmation of belief." *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 977 (1st Cir. 1993); *accord Wooley v. Maynard*, 430 U.S. 705, 715 (1977). "[E]ach person should decide for himself or herself the ideas and beliefs

deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Puerto Rico's Birth Certificate Policy violates the First Amendment because it impermissibly forces transgender persons (1) to identify themselves through their birth certificates with a sex that was incorrectly assigned to them at birth, and (2) to disclose to third parties private, intimate and personal information about their transgender status and medical condition. *See* Section III.B.1, *infra*. Because both violations relate to the *content* of speech, they are subject to strict scrutiny. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

### 1. *The Birth Certificate Policy impermissibly compels transgender persons to publicly speak and identify with a sex and identity contrary to who they are.*

The First Amendment's protection against compelled speech shields transgender persons, like Plaintiffs, from being forced to identify with a sex inconsistent with their gender identity when presenting government identification documents. The Supreme Court has consistently "prohibit[ed] the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006).[11] The First Amendment directs "that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 800 (1988). "[C]ontent-based regulations of speech are presumptively invalid." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188 (2007).

Birth certificates are issued and required as identification by the Commonwealth, thus forcing transgender persons to speak or identify speech with which they disagree. Any claimed

---

[11] The situation is exacerbated whenever the transgender speaker is required to present a birth certificate alongside another identity document, such as a driver's license. Puerto Rico correctly allows its residents to change the gender marker on other identity documents, but categorically refuses to allow the same correction to a birth certificate. Each Plaintiff has inconsistent identity documents because their birth certificates have incorrect gender markers while their licenses and other identity documents have correct gender markers. Daniela's Decl. ¶ 24; Victoria's Decl. ¶ 16; J.G.'s Decl. ¶¶ 21, 24. If a transgender person is required in an everyday situation to submit several forms of identification, the inconsistency among the documents amounts to compelled disclosure their transgender status.

interest by Puerto Rico in the integrity and accuracy of birth certificates is insufficient to support this unnecessarily broad restriction on transgender persons' First Amendment rights. Indeed, "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Wooley*, 430 U.S. at 716–17 (quoting *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). For example, in *Wooley*, the Supreme Court held that a New Hampshire law requiring all license plates to bear the state motto "Live Free or Die" could not be justified by an asserted state interest in requiring the motto on license plates to better "facilitate[] the identification of passenger vehicles . . . ." *Id.* at 716. The Supreme Court held that New Hampshire's license plate statute "in effect requires that appellees use their private property as a 'mobile billboard' for the State's ideological message," and constituted impermissible compelled speech. *Id.* at 715. Likewise, requiring transgender persons' birth certificates to include inaccurate personal identity information constitutes impermissible compelled speech under the First Amendment.

### 2. The Birth Certificate Policy compels Plaintiffs to disclose personal and sensitive private information to third parties.

Additionally, the First Amendment encompasses "the right to speak freely and *the right to refrain from speaking at all*." *Id.* at 714 (emphasis added). "All speech inherently involves the choices of what to say and what to leave unsaid," and grants the speaker the power to decide "what not to say." *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11, 16 (1986). The principle that the First Amendment proscribes compelled speech "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact that the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and is considered an invalid content-based regulation of speech. *Riley*, 487

U.S. at 795; *see also Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 145 (2016) ("[I]n order to make out a valid compelled-speech claim, a party must establish (1) speech; (2) to which he objects; that is (3) compelled by some governmental action.").

The Birth Certificate Policy impermissibly burdens the transgender speaker's right *not* to speak, because the speaker cannot avoid revealing his or her status as transgender anytime they are required to present a birth certificate.

### D.   The Policy Cannot Be Justified Under Any Standard of Review.

Puerto Rico's Birth Certificate Policy cannot survive *any* level of scrutiny, much less the exacting inquiry required by heightened scrutiny.[12] Among just a few outlier U.S. jurisdictions with a draconian policy prohibiting transgender persons from correcting the gender markers on birth certificates, Puerto Rico lacks even a legitimate and rational government interest justifying its Birth Certificate Policy.

#### 1.   *There is no rational basis for the Birth Certificate Policy.*

"[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be obtained." *Romer*, 517 U.S. at 632; *see also Hager v. Sec'y of Air Force*, 938 F.2d 1449, 1454 (1st Cir. 1991) (recognizing that even rational basis review "is not toothless"). The justifications offered must have a "footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-38 (1973). And even when the government offers an ostensibly legitimate purpose, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. "Moreover, the classification must

---

[12] Discrimination against this historically disadvantaged minority at the very least warrants "intensified scrutiny of purported justifications." *Mass. v. U.S. Dept. of H.H.S.*, 682 F. 3d 1, 10 (1st Cir. 2012).

substantially serve an . . . interest *today,* for 'in interpreting the equal protection guarantee, we have recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged.'" *Morales-Santana*, 2017 WL 2507339, at *9 (quoting *Obergefell*, 135 S. Ct. at 2603) (emphasis in original, alterations omitted).

The Birth Certificate Policy cannot be justified by an interest in the integrity or accuracy of birth certificates. Indeed, if anything, the Birth Certificate Policy as applied to transgender persons actually undermines such a goal by purporting to certify plainly *inaccurate* information with respect to transgender persons' sex. Just like the "absence of any procedure for changing the sex designation on an individual's license does not bear a close and substantial relationship to the furtherance of the state's interest in accurate documentation and identification," *K.L.*, 2012 WL 2685183, at *7, the same is true with regards to birth certificates. By "not allowing transgender[] individuals to change their sex designation," their certificates "will inaccurately describe the discernable appearance of the [] holder by not reflecting the holder's lived gender expression of identity." *Id.* The Commonwealth disregards this salient fact, and instead arbitrarily compels transgender persons to present themselves with a gender marker that is inaccurate. There is no rational connection between forcing a person to be dishonest about their sex and any interest in maintaining the integrity and accuracy of birth certificates.

Moreover, many transgender persons manage to obtain other identity documents that do accurately reflect their sex, including U.S. passports and, most notably, driver's licenses issued by the Commonwealth itself. *See*, *e.g.*, Daniela's Decl. ¶ 22; Victoria's Decl. ¶ 14; J.G.'s Decl. ¶¶ 17, 18. The Commonwealth cannot argue that it is trying to preserve the integrity of the identity information included on transgender persons' birth certificates while simultaneously allowing transgender persons to correct other Commonwealth-issued identity documents. There is no

rational basis for treating these types of identification documents differently. *See K.L.*, 2012 WL 2685183, at *7 ("the absence of any procedure for changing the sex designation on an individual's license can create discrepancies and inaccuracies between Alaska driver's licenses [and] other forms of government issued identification"); *Love*, 146 F. Supp. 3d at 856-57.

Similarly, the Birth Certificate Policy cannot be justified as necessary to capture some purportedly objective, enduring "fact" of a person's sex. The gender marker on an uncorrected birth certificate does not account for any sex-related characteristics other than a person's external genitalia at the time of birth. *See* Ettner Decl. ¶¶ 13, 38. Most importantly, it does not account for a person's gender identity, which is the primary determinant of a person's sex and has a biological basis. *Id.* at ¶¶ 17, 21. As the Seventh Circuit recently recognized, a designation of sex on a birth certificate determined from external genitalia alone is not "a true proxy for an individual's biological sex." *Whitaker*, 2017 WL 2331751, at *13; *see also* Ettner Decl. ¶ 14 ("External genitalia alone—the criterion for assigning sex at birth—is not an accurate proxy for a person's sex."). It "does not take into account an individual's chromosomal makeup," *Whitaker*, 2017 WL 2331751, at *13, or an individual's internal reproductive organs, hormones, and secondary-sex characteristics. Ettner Decl. ¶ 15. And it is "unclear what would happen if an individual is born with the external genitalia of two sexes, or genitalia that is ambiguous in nature." *Whitaker*, 2017 WL 2331751, at *13. Thus, "the marker on the birth certificate [does] not adequately account for or reflect one's biological sex, which would have to be determined by considering more than what was listed on the paper." *Id*.

Additionally, Puerto Rico cannot claim that its Birth Certificate Policy is somehow rational because a birth certificate is a record of the holder's assigned sex at a particular moment in time, i.e., birth. Puerto Rico permits all sorts of amendments to birth certificates, including name changes,

24 L.P.R.A. § 1231, and changes to the parents listed on a birth certificate after an adoption, 24 L.P.R.A. § 1136. The fact that these types of changes are allowed to correct for information that has changed or has been discovered after the "moment in time" of birth demonstrates that there is no rational basis for the Puerto Rico's Birth Certificate Policy with respect to sex. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 n.4 (2001) ("[P]urported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects."); *Romer*, 517 U.S. at 635; *Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (no rational basis where law was "riddled with exceptions" for similarly situated groups).

### 2. *Puerto Rico's Birth Certificate Policy fails under heightened or strict scrutiny.*

Even if this Court were to determine that the Birth Certificate Policy has a rational relation to a legitimate government purpose (which it does not), as discussed in Sections III.A., B, and C, *supra*, heightened scrutiny nonetheless applies. Even assuming *arguendo* that the Birth Certificate Policy furthers an important or compelling government interest (which, again, it does not), the Policy is not narrowly tailored to serve that interest because it can be served by less intrusive means. *See, e.g., Morales-Santana*, 2017 WL 2507339, at *11 n.13 ("[O]ur decisions reject measures that classify unnecessarily and overbroadly by gender when more accurate and impartial lines can be drawn."); *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003) ("Narrow tailoring does, however, require serious, good faith consideration of workable . . . alternatives" to achieve government interest). For example, Puerto Rico already has in place processes to provide accurate birth certificates to adoptees, without strikethroughs, while maintaining the original record issued at birth under seal by the registry. Applying this policy to Plaintiffs' requests for corrections to the gender marker and names on their birth certificates would permit the Commonwealth to maintain a historical record of sex and name as assigned at birth under seal, while at the same time permitting Plaintiffs to obtain and present an accurate birth certificate.

Furthermore, Puerto Rico's Birth Certificate Policy stands in sharp contrast to the approach of the overwhelming majority of jurisdictions in the United States, including 46 states, the District of Columbia, Guam, and the Northern Mariana Islands, which allow transgender persons to correct the gender marker on their birth certificates to match their gender identity and to accurately reflect their sex, without revealing their transgender status.[13] "[T]hese states have [no] less interest in ensuring an accurate record-keeping system" than the Commonwealth. *Love*, 146 F. Supp. 3d at 857. Thus, the Commonwealth cannot seriously maintain that the Birth Certificate Policy "narrowly serves the state's interest in maintaining 'accurate' identification documents." *Id.*

## IV.    **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for summary judgment and declare Puerto Rico's Birth Certificate Policy unconstitutional.

Dated on this 26th day of June, 2017.

---

[13] *See* Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Mich. J. Gender & L. 373, 381 (2013), https://goo.gl/h5rgGz (collecting statutes and regulations regarding corrections to gender markers in birth certificates for all U.S. jurisdictions). It also goes against the prevailing trend of modernizing policies to ease the burden placed on transgender people seeking to correct the gender marker on their birth certificates by removing surgical requirements and introducing measures to protect privacy. *See, e.g.*, Kristena Hansen, *Oregon Shields Birth Record Changes for Transgender People*, The Register-Guard, June 1, 2017, https://goo.gl/WCiHXi; Associated Press, *Delaware Adopts New Transgender Birth Certificate Rules*, The News Journal, Nov 4, 2016, https://goo.gl/gLhSzK; Michael Lavers, *Md. Birth Certificates Law Takes Effect*, Washington Blade, Oct 5, 2015, https://goo.gl/V565qe; Emily Hewlings, *Massachusetts Ends Surgery Requirement For Legally Changing Gender On Birth Certificates*, Daily Hampshire Gazette, Aug. 24, 2015, https://goo.gl/VufPhv; Cathy Bussewitz, *Hawaii Eases Process To Switch Gender On Birth Certificates*, The Orange County Register, July 13, 2015, https://goo.gl/qcmnPg; Mitch Kellaway, *Connecticut Makes Changing Birth Certificates Easier for Trans Folks*, The Advocate, June 30, 2015, https://goo.gl/HBYX4P; Parker Malloy*, California Becomes Easiest Place for Trans People to Amend Birth Certificates*, The Advocate, July 2, 2014, https://goo.gl/CN2cgW (all websites last visited June 21, 2017).

Respectfully submitted,

Richard D. Batchelder, Jr.*
R. Daniel O'Connor*
Aliki Sofis*
Sara Jones*
David C. Soutter*
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, Massachusetts 02199
t: (617) 951-7000 | f: (617) 951-7050
Richard.Batchelder@ropesgray.com
Daniel.OConnor@ropesgray.com
Aliki.Sofis@ropesgray.com
Sara.Jones@ropesgray.com
David.Soutter@ropesgray.com

Bonnie Doyle*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
t: (212) 596-9000 | f: (212) 596-9090
Bonnie.Doyle@ropesgray.com

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan*
Demoya R. Gordon*
M. Dru Levasseur*
LAMBDA LEGAL DEFENSE AND
        EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
t: (212) 809-8585 | f: (212) 809-0055
ogonzalez-pagan@lambdalegal.org
dgordon@lambdalegal.org
dlevasseur@lambdalegal.org

Kara N. Ingelhart*
LAMBDA LEGAL DEFENSE AND
        EDUCATION FUND, INC.
105 West Adams Street, Suite 2600
Chicago, Illinois 60603
t: (312) 663-4413 | f: (312) 663-4307
kingelhart@lambdalegal.org

Celina Romany-Siaca
(USDCPR 121811)
CELINA ROMANY LAW OFFICES
268 Muñoz Rivera Avenue, Suite 1500
San Juan, Puerto Rico 00918
t: (787) 754-9304 | f: (787) 754-9324
bufetecelinaromany@gmail.com

*Attorneys for Plaintiffs*

\* Admitted *pro hac vice.*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing brief with the Clerk of the United States District Court for the District of Puerto Rico via the CM/ECF system this 26th day of June, 2017.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, New York 10005
t: (212) 809-8585 | f: (212) 809-0055
ogonzalez-pagan@lambdalegal.org
