IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

DANIELA ARROYO GONZALEZ;
VICTORIA RODRIGUEZ ROLDAN;
J.G.; PUERTO RICO PARA TOD@S

Plaintiffs

vs

RICARDO ROSSELLO NEVARES, in his official capacity as Governor of the Commonwealth of Puerto Rico; RAFAEL RODRIGUEZ-MERCADO, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; WANDA LLOVET DIAZ, in her official capacity as Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico

Defendants

CIVIL 17-1457CCC

**OPINION AND ORDER**

This is an action for declaratory relief brought by three transgenders and an organization that advocates for the civil rights of LGBT people in the Commonwealth of Puerto Rico. They seek one common determination: that defendants be ordered to permit transgender persons born in Puerto Rico to correct their birth certificates to accurately reflect their true sex, consistent with their gender identity, in accordance with the practice delineated in 24 L.P.R.A. section 1136[1] and without adhering to the practice delineated in 24 L.P.R.A.

---

[1] 24 L.P.R.A. section 1136 provides: "If the birth of an adoptee had previously been registered in the Vital Statistics Registry, **the registration certificate of such birth shall be substituted for another showing the new juridic status of the registered child**, as if he were a legitimate child of the adopters; Provided, that the original registration certificate of the birth of

CIVIL 17-1457CCC            2

section 1231 of using a strike-out line to change one's name, or otherwise including any information that would disclose a person's transgender status on the face of the birth certificate. *See* Amended Complaint (d.e. 15), Prayer's Clause (C), p. 40. A Motion to Dismiss filed on June 12, 2017 by defendants Ricardo Rossello Nevares, in his official capacity as Governor of the Commonwealth of Puerto Rico; Rafael Rodriguez Mercado, in his official capacity as Secretary of the Department of Health of the Commonwealth of Puerto Rico; and Wanda LLovet Diaz, in her official capacity as Director of the Division of Demographic Registry and Vital Statistics of the Commonwealth of Puerto Rico (d.e. 22), was denied on August 29, 2017 (d.e. 35). Defendants have not filed an answer to the amended complaint. Plaintiffs filed a Motion for Summary Judgment on June 26, 2017 (d.e. 26), accompanied by a Statement of Material Facts (d.e. 26-1).

Having considered the Motion for Summary Judgment, the declarations under penalty of perjury executed by the plaintiffs and other supporting materials, as well as defendants' opposition, the Court sets forth the following material facts that remain undisputed:

---

the adoptee, the decision of the court, and other documents shall be kept in the Registry in a sealed envelope and shall be confidential documents. In no registration certificate issued by the Registry shall the fact of the original registration be set forth, unless the petitioner of said certificate has expressly required the showing of such facts and a competent court has so ordered for justified causes; Provided, That such authorization shall not be required when the applicant be the adopter or the adoptee." (Emphasis ours).

## **Findings of Fact**

1. Plaintiffs are three transgender individuals and an organization with transgender members that seek to have their Puerto Rico birth certificates amended to accurately reflect their gender identity.

2. Ms. Daniela Arroyo's and Ms. Victoria Rodriguez's gender identity and expression is female.

3. Mr. J.G.'s gender identity and expression is male. His transgender status is not publicly known, nor known by his current employer or co-workers.

4. Ms. Arroyo and Ms. Rodriguez have aligned their body characteristics, appearance, and lived experience with their female gender identity.

5. Mr. J.G. has aligned his body characteristics, appearance, and lived experience with his male gender identity.

6. All three plaintiffs wish to correct the gender marker on their birth certificates.

7. Ms. Arroyo and Ms. Rodriguez wish to correct the gender markers on their birth certificates to accurately reflect the identity of each as a woman, as determined by their gender identity.

8. Mr. J.G. wishes to correct the gender marker on his birth certificate to accurately reflect his identity as a man, as determined by his gender identity.

CIVIL 17-1457CCC 4

9. Ms. Arroyo's and Ms. Rodriguez' birth certificates do not reflect their true identity, are incongruent with their female identity and expression, and conflict with their other identification documents.

10. Mr. J.G.'s birth certificate does not reflect his true identity, is incongruent with his male identity and expression, and conflicts with his other identification documents.

11. Ms. Rodríguez changed her name and corrected the gender marker on her driver's license, U.S. Passport, and Social Security records.

12. Mr. J.G. changed his name on his birth certificate and has also changed his name and corrected the gender marker on his driver's license and Social Security records.

13. An individual's birth certificate is a primary identification document. In Puerto Rico, it is needed to obtain a driver's license, a marriage license, a U.S. passport, a Social Security card, a voting card, and generally as proof of identification to conduct banking transactions and other business.

14. Pursuant to its Birth Certificate Policy, Puerto Rico categorically requires that birth certificates reflect the sex assigned at birth and prohibits transgender persons from correcting the gender marker in their birth certificates so that these accurately reflect the persons' sex, as determined by their gender identity.

15. Birth certificates in Puerto Rico indicate a person's birth-assigned sex based on the appearance of genitalia rather than their actual sex, as determined by their gender identity and lived experience.

16. Transgenderism is an immutable characteristic determined by the hormonal balance a person is born with. It is an innate trait caused by an individual's biological features and genetic makeup. Some scientists confirm that brain development is influenced by the prenatal environment, that is, to what hormones the fetus was exposed to in the uterus. For example, exposure to inadequate levels of estrogen during development of the fetus because of insufficient estrogen production in the fetus' immediate environment or poor receptive sensitivity in the fetus, are possible scenarios underlying insufficient feminization.

17. Ms. Rodriguez is 28 years old, born in Puerto Rico, and currently a resident of the District of Columbia metropolitan area. She is a graduate of the University of Puerto Rico and of the University of Maine School of Law. She is a transgender who was designated "male" in her birth certificate. She learned the term transgender at the age of 14. Ms. Rodriguez kept her gender secret until she was 18 and had started college for fear of rejection by her family. In 2007, by her sophomore year, she asked her professors and others to call her by her chosen name, Victoria. Calling her 'Victoria' during the roll call prevented disclosure of her transgender status to other students. She was diagnosed that

        same year by her medical provider with gender dysphoria and underwent hormone therapy to relieve the condition. In 2011, while at law school, she legally changed her name and gender marker on all her identification documents, except for her birth certificate.

18. Ms. Arroyo is 18 years old, a high school graduate, transgender, designated "male" in her birth certificate, who states she never questioned that she was a girl, so informed her family when she was a young girl, and told her mother that she was a transgender at the age 14. This led her to begin at that age to socially and medically transition to align her life experience and body characteristics with her gender identity. She began hormone therapy in 2016 after having been diagnosed with gender dysphoria in 2013. Ms. Arroyo is cofounder of the Puerto Rico Trans Youth Coalition since 2015, an organization that provides a network for transgender youth in Puerto Rico with over 200 participants. In February 2017, she legally changed her name to her current female name. In March 2017, she began the process to correct her name and gender marker in her identification documents to accurately reflect her gender identity as female but has been prohibited from correcting the gender marker in her birth certificate because of Puerto Rico's Birth Certificate Policy, thereby rendering her birth certificate incongruent with her other identification papers.

CIVIL 17-1457CCC 7

19. Mr. J.G. is 25 years old, born and raised in San Juan, Puerto Rico, and designated as female on his birth certificate. He described his childhood as a solitary life. Since age four (4) he knew he was different from the children whose assigned sex at birth was female. This caused him profound discomfort and it was not until his young adulthood that Mr. J.G. was able to understand the cause of his distress: the clash between his perception of self and the sex characteristics of his body. In 2015, he commenced to medically transition to align his body characteristics and live his true self, as a man. That same year, having been diagnosed with gender dysphoria, he commenced hormone treatment.

20. The incongruence between a transgender person's gender identity and sex assigned at birth is associated with gender dysphoria. Gender dysphoria is a serious medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Ed. (2013)("DSM-V").

21. Gender dysphoria refers to clinically significant distress that can result when a person's gender identity differs from the person's birth-assigned sex. If left untreated, gender dysphoria may result in psychological distress, anxiety, depression, suicidal ideation or even self-inflicted harm.

22. Identity documents that are consistent with one's lived experience affirm and consolidate one's gender identity, mitigating distress and functional consequences. Changes in gender presentation and

      role to feminize or masculinize appearance as well as social acceptance and legal legitimacy are crucial components of treatment for gender dysphoria. Social transition involves dressing, grooming, and otherwise outwardly presenting oneself through social signifiers of a person's true sex as determined by their affirmed gender identity.

23. Not every person suffering from gender dysphoria undergoes the same treatment. From a medical and scientific perspective, there is no basis for refusing to acknowledge a transgender person's true sex based on whether that person has undergone surgery or any other medical treatment.

24. Ms. Arroyo was diagnosed with gender dysphoria by her medical provider in the year 2013. In 2016, in consultation with her medical and mental health professionals, she began to undergo medically-necessary treatment, specifically hormone therapy, to relieve her gender dysphoria and to bring her body into alignment with her gender identity. During this transition, she brought her external appearance into alignment with her female identity.

25. Ms. Rodriguez was diagnosed with gender dysphoria by her medical provider in the year 2007. In consultation with her medical and mental health professionals, she began hormone therapy, to relieve her gender dysphoria and bring her body into alignment with her female identity.

26. Mr. J.G. was diagnosed in 2015 with gender dysphoria. In consultation with his medical and mental health professionals, he began to undergo hormone therapy to relieve his gender dysphoria and bring his body in alignment with his gender identity. These steps brought his physical appearance into alignment with his male identity.

27. Ms. Arroyo and Mr. J.G. corrected their names on their respective birth certificates but pursuant to Puerto Rico's birth certificate policy, were prohibited from correcting the gender marker on their birth certificates.

28. Ms. Rodriguez has not changed her name on her birth certificate since she deems it to be futile given the prohibition related to the correction of the gender marker in her certificate.

29. Ms. Arroyo asserts she feels stigmatized and harmed by Puerto Rico's birth certificate policy and claims her right to possess identity documents that accurately reflect who she is – a woman.

30. Ms. Rodriguez states she considers it futile to correct the name on her birth certificate since it is impossible to obtain a correction of the gender marker on her birth certificate. As a consequence, her birth certificate, which identifies her with a male name and sex, and her other identification documents, drivers' license and U.S. passport, are incongruent with each other. She asserts the need for her identity documents to be consistent with the woman that she is.

31. Mr. J.G. legally changed his name in 2016 to one traditionally associated with men. He updated his name and corrected the gender marker in his Puerto Rico driver's license in accordance with a policy followed by the Department of Transportation and Public Works of the Commonwealth. He also corrected his Social Security records and updated his name in his birth certificate. However, due to Puerto Rico's Birth Certificate Policy, he was precluded from correcting the gender marker on his birth certificate. He attempted in April 2016 to correct the gender marker on his Puerto Rico voter identification card after the local Board of Registration staff requested his birth certificate. This was denied. As a result of this, Mr. J.G. did not vote in the 2016 election because the presentation of his voter identification card disclosed his transgender status.

32. The forced disclosure of the transgender status of plaintiffs and other transgender persons by way of inaccurate birth certificates exposes them to prejudice, discrimination, distress, harassment, and violence.

33. On November 14, 2008, the Commonwealth of Puerto Rico (the "Commonwealth") issued Executive Order OE-2008-57 that established as a matter of public policy the prohibition of discrimination in the provision of public services. It applies to all public agencies and instrumentalities, including the Demographic

   Registry of Puerto Rico.  Such sweeping outlawed discrimination in all forms, including gender identity.

34. Pursuant to this public policy, on August 10, 2015, the Commonwealth issued Executive Order OE-2015-029, permitting transgender individuals to change their gender marker in their driver's license.  On June 19, 2014, the Department of Transportation and Public Works issued regulations implementing the Executive Order.

35. Pursuant to the aforementioned Executive Orders, on May 31, 2016, the Electoral Commission of the Commonwealth of Puerto Rico issued Resolution CEE-RS-16-9, permitting transgender individuals to change the gender marker on their voter identification cards.

36. The Department of Transportation and Public Works and the Electoral Commission of the Commonwealth of Puerto Rico both issue identification cards that reflect the applicant's correct gender marker in accordance with the public policy outlined in OE-2008-57, without disclosing the sex that was assigned at birth.

Based on these Findings of Fact, the Court states the following:

## Conclusions of Law

The Supreme Court recognizes that "a constitutional right to privacy is now well established." *Daury v. Smith*, 842 F.2d 9, 13 (1st Cir. 1988) (referring to *Roe v. Wade*, 410 U.S. 113, 92 S.Ct. 705, 35 L.Ed. 2d 147 (1973);

*Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed. 2d 510 (1965). The majority opinion in *Ex parte Delgado Hernández*, 165 D.P.R. 170 (2005), which defendants relied on in their opposition, is limited to the statutory interpretation of the Demographic Registry Law of Puerto Rico, 24 L.P.R.A. § 1071 et seq., and does not supersede this fundamental constitutional right. *See Fournier v. Reardon*, 160 F.3d 754, 758 (1st Cir. 1998) (stating that the constitutional right to privacy is deemed fundamental).

"The courts have identified two clusters of personal privacy rights recognized by the Fourteenth Amendment. One bundle of rights relates to ensuring autonomy in making certain kinds of significant personal decisions; the other relates to ensuring confidentiality of personal matters." *Vega-Rodriguez v. Puerto Rico Telephone Co.*, 110 F.3d 174, 182-83 (D.P.R. 1997) (referring to *Whalen v. Roe*, 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed. 2d 64 (1977); *Borucki v. Ryan*, 827 F.2d 836, 840 (1st Cir. 1987)).

"The autonomy branch of the Fourteenth Amendment right to privacy is limited to decisions arising in the personal sphere—matters relating to marriage, procreation, contraception, family relationships, child rearing, and the like." *Vega-Rodriguez*, 110 F.3d at 183. The confidentiality branch, also referred to as 'informational privacy', *see National Aeronautics and Space Administration v. Nelson*, 562 U.S. 134, 146, 131 S.Ct. 746, 756, 178 L.Ed. 2d 667 (2011), "includes 'the individual interest in avoiding the disclosure of personal matters . . .'" *Daury*, 842 F.2d at 13 (citing *Whalen*, 429 U.S. at 599).

The Commonwealth's ban on changing the gender marker in plaintiffs' birth certificates implicates both.

The Commonwealth's forced disclosure of plaintiffs' transgender status violates their constitutional right to decisional privacy. Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, "there are few areas which more closely intimate facts of a personal nature" than one's transgender status. *Doe v. Town of Plymouth*, 825 F.Supp. 1102, 117 (D. Mass. 1993) (finding the constitutional right to privacy encompasses nondisclosure of HIV status). "The decision of who to tell and when to relate such information is an emotionally sensitive area 'fraught with serious implications for that individual.'" *Id.* (citing *Doe v. Coughlin*, 697 F.Supp. 1234, 1237 (N.D.N.Y. 1988). Disclosing that one is transgender involves a deep personal choice which the government cannot compel, unless disclosure furthers a valid public interest. "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. **At the heart of liberty is the right to define one's own concept of existence**, **of meaning, of the universe, and of the mystery of human life**. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed. 2d 674 (1992) (Emphasis ours).

By permitting plaintiffs to change the name on their birth certificate, while prohibiting the change to their gender markers, the Commonwealth forces them to disclose their transgender status in violation of their constitutional right to informational privacy. Such forced disclosure of a transgender person's most private information is not justified by any legitimate government interest. It does not further public safety, such that it would amount to a valid exercise of police power. *See Whalen*, 429 U.S. at 598. To the contrary, it exposes transgender individuals to a substantial risk of stigma, discrimination, intimidation, violence, and danger. Forcing disclosure of transgender identity chills speech and restrains engagement in the democratic process in order for transgenders to protect themselves from the real possibility of harm and humiliation. The Commonwealth's inconsistent policies not only harm the plaintiffs before the Court; it also hurts society as a whole by depriving all from the voices of the transgender community.

Having determined that the Commonwealth's Birth Certificate Policy violates transgender persons' decisional privacy and informational privacy, and further considering that: (1) the Commonwealth has adopted a public policy that prohibits discrimination by public agencies and instrumentalities in providing their services, including discrimination based on gender identity, and (2) the Department of Transportation and Motor Vehicles and the Election Commission of the Commonwealth have enabled transgender individuals to apply for new official identifications that display their true gender, without disclosing their transgender status, IT IS HEREBY ORDERED AND ADJUDGED that the Demographic Registry of the Commonwealth of Puerto

CIVIL 17-1457CCC            15

Rico permit forthwith that transgender individuals change the gender marker in their birth certificates, as delineated in 24 L.P.R.A. section 1136, specifically, **by issuing a new birth certificate** with the applicant's true gender, without using a strike-out line or otherwise including any information that would disclose a person's transgender status on the face of the birth certificate, in compliance with this Opinion and Order.

The Demographic Registry of the Commonwealth of Puerto Rico **SHALL ADOPT** the criteria of the Department of Transportation and Public Work's "Request to Change Transgender Persons' Gender Marker," DTOP-DIS-324 Form, as **the** application form to be submitted by transgenders and which shall be accepted as the first step towards the issuance of their new birth certificates, in compliance with the Court's mandate. *See* Attachment A to the Judgment. The transgender individual shall present the application accompanied by one of the following documents: (1) a passport that reflects a person's true gender, whether female or male, (2) a driver's license that reflects the person's true gender, whether female or male, or (3) a certification issued by a healthcare professional or mental health professional with whom the person has a doctor-patient relationship stating, based on his or her professional opinion, the true gender identity of the applicant, whether female or male, and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future. If the applicant has not had any of the documents requested previously issued, a health care professional or mental health professional with whom the applicant has a doctor-patient relationship must certify based on his or her professional opinion

CIVIL 17-1457CCC                            16

that the true gender identity of the applicant is ( ) female or ( ) male and that it is expected that this will continue to be the gender with which the applicant will identify him or herself in the future.  *See* Part B of DTOP-DIS-32 Form, which is included as Attachment A to the Judgment.

## **Conclusion**

The right to identify our own existence lies at the heart of one's humanity. And so, we must heed their voices: "the woman that I am," "the man that I am." Plaintiffs know they are not fodder for memoranda legalese.  They have stepped up for those whose voices, debilitated by raw discrimination, have been hushed into silence.  They cannot wait for another generation, hoping for a lawmaker to act.  They, like Linda Brown, took the steps to the courthouse to demand what is due:

> their right to exist, to live more and die less.

SO ORDERED.

At San Juan, Puerto Rico, on April 20, 2018.

S/CARMEN CONSUELO CEREZO
United States District Judge